# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MACHAEL MARIE CASTRO,<br><br>　　　　Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,<br><br>　　　　Defendant. | ) 1:11-cv-02062-SKO<br>)<br>) **ORDER REGARDING PLAINTIFF'S**<br>) **SOCIAL SECURITY COMPLAINT**<br>)<br>) (Docket No. 1)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## I.  BACKGROUND

Plaintiff Machael Marie Castro ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application for Supplemental Security Income ("SSI") pursuant to Title XVI of the Social Security Act (the "Act"). 42 U.S.C. § 1383(c)(3).  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

## II.  FACTUAL BACKGROUND

Plaintiff was born in 1964, completed a certified nursing assistant program, and worked as caregiver.  (Administrative Record ("AR") 30-31, 69, 81, 147, 174.)  On August 14, 2007, Plaintiff filed an application for SSI, alleging disability beginning on August 1, 2007, due to severe back

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  (Docs. 8, 9.)

problems, anxiety, scoliosis of the spine, bipolar disorder, diabetes mellitus, and fracture of lower limb.  (AR 69-88, 147-53, 161, 173.)

**A.   Medical Evidence**

Plaintiff's medical records pre-date Plaintiff's alleged onset date of August 1, 2007.  (*See* AR 69-88.)  On March 29, 2006, Plaintiff saw Kenneth Bernstein, M.D., at Darin M. Carmarena Health Center for hypertension, diabetes, asthma, and bipolar disorder.  (AR 284.)  Dr. Bernstein continued Plaintiff's medication regime and indicated that her thyroid would be reassessed.  (AR 284.)

On April 28, 2006, a computed tomography ("CT") scan was performed at Fresno Imaging Center on Plaintiff's cervical and lumbar spine, which revealed right posterolateral disc protrusion, moderate narrowing of the left neural foramen, moderate anterior compression fracture, marked left neural forminal stenosis with bulging disc, and moderate left posterocentral marginal hypertropic spur with mild effacement.  (AR 330-34.)

Plaintiff was seen by Dr. Bernstein between April and November 2006 for diabetes and hypertension re-checks.  (AR 224, 229, 288-94.)  On April 28, 2006, Dr. Bernstein discussed bariatric surgery and adjusted Plaintiff's medication.  (AR 288.)  On June 23, 2006, Dr. Bernstein noted that Plaintiff was "doing okay and stable."  (AR 292.)  On October 18, 2006, Dr. Bernstein reported that Plaintiff had "questionable anxiety and psychogenic component" and a "history of bipolar disorder, diabetes mellitus, history of osteoarthritis, reflux esophagitis, and asthma."  (AR 229.)  Plaintiff had "noticed clicking on lower extremities, which is DVT [deep vein thrombosis] in nature."  (AR 229.)  On November 3, 2006, Dr. Bernstein indicated that Plaintiff has a history of migraine headaches and needed her medication adjusted.  (AR 223.)

On January 18, 2007, Dr. Bernstein saw Plaintiff for a diabetic re-check.  (AR 224, 295.)

On March 19, 2007, Dr. Bernstein stated that Plaintiff has a "history of auto accident" but that she was "doing much better."  (AR 225, 296-97.)  Plaintiff was treated for diabetes and morbid obesity, and she was referred for a gastric bypass.  (AR 225, 296-97.)

On April 13, 2007, Plaintiff was seen by a licensed nurse practitioner at Madera Community Hospital for a referral for gastric bypass surgery.  (AR 274.)  Plaintiff was assessed with an eating disorder and morbid obesity, but informed that there was no gastric bypass available for MediCal

patients at that facility. (AR 274.)  Plaintiff was referred to a different facility that accepted MediCal patients but required $3,000 for the procedure.  (AR 274.)

On May 7, 2007, Plaintiff was seen by Dr. Bernstein for leg pain and a rash.  (AR 227, 298-99.)  Plaintiff reported to that she had been in "pain on and off for a month . . . .  The left upper calf cramps up."  (AR 227, 298.)  Dr. Bernstein noted "some tenderness" but that "flexion and extension are okay" and that Plaintiff's "[j]oints seemed okay."  (AR 227. 298.)

On July 17, 2007, Plaintiff underwent a sleep study at Madera Community Hospital, and was referred for a pulmonary evaluation.  (AR 273.)

On June 18, 2007, Dr. Bernstein saw Plaintiff for a re-check, and on September 11, 2007, Dr. Bernstein saw Plaintiff for a medication re-fill.  (AR 300, 302.)

On October 5, 2007, Plaintiff was seen by Orlando T. Collado, M.D., at Madera County Behavioral Health Services.  (AR 384.)  Plaintiff was diagnosed with bipolar disorder depressed. (AR 386.)  Plaintiff reported some problem with her medication, which was adjusted.  (AR 384.) Plaintiff had made "minimal improvement."  (AR 384.) Plaintiff returned on October 29, 2007, and indicated that she was "doing fine" on her medication, although she had experienced weight gain. (AR 386.)

On October 17, 2007, J. Martin, M.D., conducted a physical examination of Plaintiff.  (AR 230-32.)  Dr. Martin noted Plaintiff's medical complaints as being "high blood pressure, asthma, diabetes and 'arthritis.'" (AR 230.)  Plaintiff reported that she had been treated for high blood pressure and diabetes for seven years and had been medication compliant.  (AR 230.)  Plaintiff reported that she had a heart murmur and had been diagnosed with osteoarthritis and rheumatoid arthritis "for many years."  (AR 230.)  Plaintiff also reported a "lifelong history of asthma."  (AR 230.) Dr. Martin reviewed "some clinic notes" and noted that there "was no mention of any arthritic diagnosis in the provided records."  (AR 230.)  Upon examination, Dr. Martin found that Plaintiff had "[s]ome difficulty . . . transferring on/off the examination table and moving about the site." (AR 231.)  In evaluating Plaintiff's musculoskeletal system, her "[c]ooperation was unclear with some grimacing and pain vocalization as well as cogwheeling[,] none of which were noted casually."  (AR 231.)  Dr. Martin assessed Plaintiff with the medical/physical issues of obesity/deconditioned state,

hypertension, asthma, non-insulin dependent diabetes, and "'arthritis,' not otherwise specified." (AR 232.)  Dr. Martin opined that Plaintiff "could lift no more than 10 pounds at a time and carry 5 pounds," and that there was "no specific indication for restriction from standing, sitting, gross or fine motor manipulations.   The claimant should be provided work space devoid of non-bronchospastic agents.  The claimant would likely benefit from weight loss." (AR 232.)

On November 9, 2007, Elpidio A. Fonte, M.D., reviewed Plaintiff's records and provided a physical residual functional capacity ("RFC")[2] assessment.  (AR 233-37.)  Dr. Fonte noted that Plaintiff was primarily diagnosed with diabetes, hypertension, and heart murmur, and secondarily diagnosed with lumbar strain, asthma, and obesity.  (AR 233.)  Dr. Fonte opined that Plaintiff was able to lift and/or carry 20 pounds occasionally and 10 pounds frequently, could sit, stand, and walk 6 hours in an 8-hour day, and was unlimited in her ability to push and/or pull.  (AR 234.)  Dr. Fonte indicated that Plaintiff had no other limitations other than the need to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc.  (AR 235-36.)  Dr. Fonte provided a case analysis, and noted that Plaintiff's alleged back problems were not support by x-rays of the lumbar spine and that she did not have significant medical records to support her allegations concerning her mental condition.  (AR 240.)

On November 12, 2007, Aimée V. Riffel, Ph.D., performed a psychological evaluation of Plaintiff.  (AR 242-47.)  Plaintiff indicated that her chief complaints were "[b]ipolar disorder, sleep apnea, obesity, high blood pressure, diabetes, asthma, osteo [and] rheumatoid arthritis, scoliosis and gout."  (AR 243.)  Plaintiff reported that she was limited in her ability to work because she was "dealing with feeling suicidal now (this phase of illness, but not at this moment)," would "sleep all day," was "depressed," and "constantly ha[d] to have people around [her] because [she] can't be alone."  (AR 243.)  Plaintiff stated that she attempted to work in 2007 doing in-home care, earning minimum wage, but quit after approximately one month because she "couldn't do it" and couldn't "stand people."  (AR 243.)  Plaintiff's history included "psychiatric hospitalization, suicidal or

---

[2] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.*

aggressive behavior, 5150, individual counseling services, and medication management for psychiatric condition." (AR 243.)  Dr. Riffel provided a diagnostic impression of bipolar disorder, not otherwise specified, and limited coping skills and social interests.  (AR 246.)

Based on the mental status examination, clinical interview including personal history, and review of the medical records, Dr. Riffel opined that Plaintiff had a "fair" ability to understand, remember and follow very short and simple instructions, and a "fair" level of concentration, pace, and persistence to perform one- or two-step simple instructions and repetitive tasks.  (AR 246.) Plaintiff's ability to relate to others, including co-workers, supervisory personnel, and the general public, was poor.  (AR 246.)  Plaintiff needed a "considerable level of support for her emotional, medical and mental health needs."  (AR 246.)  Dr. Riffel further opined that Plaintiff "may also have a tendency to incorporate outside individuals into her delusions that may influence or exacerbate her symptoms of paranoia."  (AR 246.)  Plaintiff's ability to handle the stresses and pressures of work activities was "poor," and her ability to manage changes in a routine work situation was "moderately impaired."  (AR 246.)  Plaintiff was assessed with a Global Assessment of Functioning score ("GAF") of 55.[3]  Dr. Riffel noted that, although Plaintiff received psychopharmacological medications and mental health services, her overall functioning had not significantly improved.  (AR 246.)

On November 21, 2007, Plaintiff was seen by Dr. Bernstein and complained of lower back pain.  (AR 306.)  Dr. Bernstein noted tenderness in the lumbosacral region and the lower thoracic region, and stated that Plaintiff's "back sprain/strain is chronic."  (AR 306.)

On December 4, 2007, Plaintiff was seen at Madera Community Hospital for a leg fracture. (AR 271.)  Plaintiff was prescribed Tylenol with codeine and provided an orthopedic referral.  (AR 271.)  A cast was placed on Plaintiff's leg.  (AR 270.)

On December 5, 2007, Marina C. Vea, M.D., reviewed Plaintiff's records and completed a psychiatric review technique form.  (AR 248-61.)  Dr. Vea noted that Plaintiff had mild limitations

---

[3] The GAF scale, also referred to as the Axis V diagnosis, is the consideration of "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. Text rev. 2000) [hereinafter "DSM-IV"].  A score between fifty-one and sixty indicates some moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* at 34.

related to restrictions of activities of daily living and maintaining concentration, persistence, or pace, and moderate limitations maintaining social functioning.  (AR 256.)  Plaintiff had no episodes of decompensation of an extended duration.  (AR 256.)  Dr. Vea indicated that Plaintiff had a history of incarceration and of drug and alcohol abuse.  (AR 258.)  Plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions, sustain an ordinary routine without special supervision, and complete a normal workday and workweek without interruptions from psychologically based symptoms; Plaintiff had no other limitations.  (AR 259-60.)  Dr. Vea opined that Plaintiff was able to understand and remember simple tasks; able to sustain concentration and attention for 8-hours a day, 40-hours a week; able to interact in a socially appropriate manner and request assistance from others; and able to adapt to routine changes in a work setting, set realistic goals, and make plans independent of others.  (AR 261.)

On December 21, 2007, Plaintiff returned to Dr. Collado.  (AR 388.)  Plaintiff indicated that she was medication compliant and that her mood was "fairly stable."  (AR 388.)  The notes indicate that Plaintiff had made "marked improvement."  (AR 388.)

In January and February 2008, Plaintiff was seen for follow-up care at Madera Community Hospital for her leg fracture.  (AR 263-64.)

On February 12, 2008, Plaintiff was seen by Dr. Bernstein for a positive strep throat.  (AR 308-09.)  Plaintiff was seen by Dr. Bernstein for a diabetic re-check on March 10, 2008.  (AR 311-12.)

On February 15, 2008, Plaintiff was seen by Dr. Collado for a medication adjustment.  (AR 390.)  Plaintiff indicated that she "still has depression and anxiety," but the notes indicated "marked improvement" to Plaintiff's progress.  (AR 390.)

On March 28, 2008, John T. Bonner, M.D., evaluated Plaintiff's medical records and affirmed Dr. Fonte's physical RFC assessment "overall," but noted Plaintiff's recent fracture.  (AR 276-83.)  Dr. Bonner noted that Plaintiff's fracture was expected to "heal and resolve" by August 2008, and that the rest of Dr. Fonte's opinion "was affirmed as written."  (AR 283.)

On March 28, 2008, Plaintiff returned to Dr. Collado for a medication adjustment.  (AR 392.)  Plaintiff indicated that she was depressed and irritable.  (AR 392.)  On April 25, 2008, Dr. Collado

was informed by Plaintiff that she was "feeling good" and had no side effects to her medication. (AR 394.)

In June 2008, Central Valley Sleep Disorders Center, Inc., prepared a report indicating that Plaintiff suffered from obstructive sleep apnea.  (AR 413-31.)

On June 27, 2008, Dr. Collado noted that Plaintiff continued to take her medication and that she was sleeping better.  (AR 396.)  Plaintiff, reported that she was "still having mood swings," but Dr. Collado noted "marked improvement" to Plaintiff's progress.  (AR 396.)

On July 17, 2008, Plaintiff was seen by Dr. Bernstein and indicated that she was "[f]eeling fine."  (AR 313.)

On October 8, 2008, Plaintiff returned to Dr. Collado and reported that the medication was making her drowsy but she did "not sleep good."  (AR 398.)  Plaintiff had been diagnosed with sleep apnea.  (AR 398.)  Plaintiff's medication was adjusted.  (AR 398.)

On December 31, 2008, Plaintiff was seen by Dr. Collado, who noted that Plaintiff's "[a]ffect is blunted" and she exhibited "minimal improvement."  (AR 400.)

On February 3, 2009, Plaintiff was seen by Waldemar Rosario, M.D., at Darin M. Camarena Health Centers for "multiple chronic health problems."  (AR 318.)  Plaintiff indicated that she "started having . . . left leg pain about a week ago without any exertion, atypical of her daily physical activities." (AR 318.)  Plaintiff reported that the pain in her leg would "get worse when she walks." (AR 318.)  Dr. Rosario noted that there was no swelling, but that the leg was "mildly tender."  (AR 318.)

On March 30, 2009, Plaintiff was seen by Dr. Collado for her bipolar disorder.  (AR 402.) Plaintiff reported that she was "babysitting her grandchildren" and that her "meds are working fine." (AR 402.)  Dr. Collado noted "marked improvement."  (AR 402.)

On April 16, 2009, Dr. Bernstein saw Plaintiff for a re-check of her diabetes and leg pain. (AR 321-23.)  On May 29, 2009, Dr. Bernstein examined Plaintiff for bilateral knee pain and a concern regarding a mark on her breast.  (AR 324-26.)

On August 6, 2009, Plaintiff was seen by Dr. Collado.  (AR 404.)  Plaintiff stated that her insurance had expired and that she had been out of medication for at least a month.  (AR 404.)

1  Plaintiff reported that "she had just been staying in her room" and that she was "irritable and not

2  sleeping.  Also state[d] that her mind does not stop."  (AR 404.)  Dr. Collado noted that Plaintiff's

3  progress was "worse" and indicated that she should continue her medications.  (AR 404.)

4      Plaintiff was seen for a diabetic re-check by Dr. Bernstein on September 28, 2009.  (AR

5  327-29.)

6      On October 29, 2009, Plaintiff returned to Dr. Collado and informed him that "things are

7  going along fine" and that her current medication was "working fine."  (AR 406.)  Plaintiff reported

8  that her mood had been "stable."  (AR 406.)  Dr. Collado noted "marked improvement."  (AR 406.)

9      On December 17, 2009, Plaintiff saw Dr. Bernstein for dizziness and leg pain.  (AR 432-34.)

10  On February 4, 2010, Plaintiff reported leg pain and tingling on the left side of her body.  (AR

11  435-37.)

12      On February 4, 2010, Dr. Bernstein completed a physical RFC questionnaire.  (AR 408-12.)

13  Dr. Bernstein indicated that he had been treating Plaintiff for three years for ailments that included

14  diabetes, hypertension, disc disease, and bipolar disorder, and that Plaintiff had pain in the lower

15  legs, upper back, and right shoulder.  (AR 408.)  Dr. Bernstein noted that the emotional factors of

16  depression, anxiety, and bipolar disorder affected Plaintiff's physical condition.  (AR 409.)  Dr.

17  Bernstein opined that Plaintiff would frequently experience pain that would interfere with a typical

18  workday, and that she was incapable of even low-stress jobs.  (AR 409.)  Plaintiff could sit

19  15-20 minutes at one time before needing to get up, sit less than a total of 2 hours in an 8-hour day,

20  and stand 15 minutes at one time before needing to walk.  (AR 409-10.)  Dr. Bernstein also indicated

21  that Plaintiff would need to take unscheduled breaks during the day.  (AR 410.)  Plaintiff could rarely

22  carry less than 10 pounds and never twist, stoop, crouch, squat, or climb ladders and stairs.  (AR

23  411.)  Dr. Bernstein could not predict how many times per month Plaintiff would likely be absent

24  from work due to her impairments.  (AR 411.)

25      On October 25, 2011, the Appeals Council added additional medical evidence to the record.

26  (See AR 5, AR 441-66.)  This evidence is as follows:  On February 25, 2010, Plaintiff was provided

27  with an Emergency Department Aftercare Sheet from Madera Community Hospital related to

28  treatment of back pain.  (AR 463.)  On March 23, 2010, Dr. Bernstein provided a list of Plaintiff's

1  diagnoses. (AR 465-66.) On December 12, 2010, Plaintiff was seen by the Emergency Department

2  of St. Agnes Medical Center for anxiety and panic attacks and for a urinary tract infection. (AR

3  462.) Plaintiff was given medication and ordered to follow-up with Dr. Bernstein. (AR 462.) On

4  January 21, 2011, Plaintiff was involuntarily admitted to Kaweah Delta Mental Hospital because she

5  was suicidal, and was discharged the following day. (AR 442-55.)

6  **B.    Lay Testimony**

7      On August 22, 2009, Plaintiff completed an adult function report. (AR 164-71.) Plaintiff

8  indicated that she lived with her son, and stated that her daily activities included staying in bed and

9  waiting for her headache to pass, and watching television in bed. (AR 164.) Plaintiff indicated that

10 she lived "so far out of town" and had "no money [and] no car," so she was "stuck at home,"

11 although a friend would visit "every couple of days," or her family would "sometimes take [her] out

12 to eat or to visit [her] friend." (AR 164.) Plaintiff stated that she used to be able to "walk, bend

13 down, pick up things, handle people, do things for [her]self and not have to depend on anyone." (AR

14 165.) Plaintiff indicated that she would have to wait a half hour after showering before she could

15 get dressed "[b]ecause of pain and being tired." (AR 165.) Further, she needed reminders to shower

16 from her family and friend. (AR 165-66.) She would also forget to take her medicine. (AR 166.)

17 Plaintiff would think that she no longer needed or could go without her medication, and then would

18 "do stupid stuff like want to kill [her]self or hurt strangers." (AR 166.)

19     Plaintiff was able to cook "quick" meals and use the microwave, although her son usually

20 did the cooking. (AR 165-66.) Plaintiff was no longer able to cook "complete meals," because she

21 could not stand up for too long due to pain in her back, hips, and legs. (AR 166.) She was unable

22 to wash dishes due to pain. (AR 166.) She did not do household work and was only able to sit for

23 10 minutes to water the grass. (AR 166.) Plaintiff would shop once a month for food and household

24 supplies with her daughter, who would drive and lift heavy items. (AR 167.) Plaintiff's only interest

25 was watching television. (AR 168.)  Plaintiff would socialize by talking on the phone with her

26 friend and family, and occasionally visit her friend. (AR 168.) She did not go anywhere on a regular

27 basis. (AR 168.)

28

Plaintiff stated that she was "unable to walk any distance, bend over, kneel, squat[], stand[] for long periods of time, reach[], or sit[] for long periods." (AR 169.) Plaintiff could only walk about "about 10 feet" before needing to rest for 15 to 20 minutes. (AR 169.) Plaintiff stated that she was unable to finish what she started and that she did not get along with authority figures. (AR 169-70.) She was fired from her job doing in home care because she "could not get along with people" and she "would get extremely angry." (AR 170.) Plaintiff also stated that she did not handle stress well, and that she "sometimes just wanted to kill [her]self." (AR 170.)

## C.    Administrative Hearing

The Commissioner denied Plaintiff's applications initially and again on reconsideration; consequently, Plaintiff requested a hearing before an administrative law judge ("ALJ"). (AR 93-107.) On February 9, 2010, ALJ James Berry held a hearing in which Plaintiff, represented by counsel, and vocational expert ("VE") Judith Najarian testified. (AR 23-55.)

### 1.    Plaintiff's Testimony

Plaintiff testified that she lived with her son, his girlfriend, and the girlfriend's son. (AR 29.) Plaintiff stated that she was disabled because she had "trouble" with her back, neck, and legs, had scoliosis of the spine, and rheumatoid and osteoarthritis of her neck, back, arms, and legs. (AR 29-30.) Plaintiff completed high school and had a certificate as a certified nursing assistant, a job that she performed "[f]or about a month to two months." (AR 30-31.) Plaintiff tried to work doing in-home care, but was unable to do the cleaning. (AR 31.)

Plaintiff testified that she had been convicted of misdemeanor welfare fraud related to caring for her niece. (AR 32.)

Plaintiff stated that she had "constant" pain between her shoulders and down her back, as well as tingling. (AR 35.) The medication did not "take it completely away, but it eases it." (AR 36.) Plaintiff stated that activities such as washing dishes, lifting, and stooping would cause back pain, as would "prolonged periods of sitting," although reclining would ease the pain. (AR 36.) Plaintiff was taking pills for her diabetes, but her blood sugar was "fluctuating" despite following her doctor's instructions and limiting carbohydrates. (AR 37.) Plaintiff believed that she had numbness in her hand caused by the diabetes. (AR 38.) Plaintiff stated that the pain in her leg

10

caused by a fracture prevented her from working.  (AR 38-39.)  Plaintiff was taking the pain medication Tylenol with Codeine Number 4.  (AR 39.)  Plaintiff would wear a mask to treat her sleep apnea.  (AR 47.)

Plaintiff reported that her bipolar disorder caused severe mood swings that occurred "at least once to twice a week" despite being on medication.  (AR 40.)  She would "also get very depressed," and would have periods when she would "lock [her]self in the room away from everybody."  (AR 41.)  Plaintiff stated that she had a "bad habit" of not seeing her therapist when she would "get scared."  (AR 41.)  Plaintiff stated that she would be "extremely tired" for two weeks, and then have two weeks where she could not sleep and would be "constantly awake."  (AR 42.)  She indicated that the last time she stopped taking her medication, she "ran someone off the road" "out of pure anger."  (AR 43.)

Plaintiff stated that she could lift a 10-pound bag of potatoes off a table, but could not stoop to lift it.  (AR 43-44.)  Plaintiff did not know how long she could stand in an eight-hour day, but that she could "stand for like fifteen minutes, because [she went] to church."  (AR 44.)  Plaintiff said she had no problems sitting, but then clarified that she would need to get up and move around.  (AR 45.)  She stated that she could sit "off-and-on" approximately five or six hours in day, but "closer" to five.  (AR 46.)  Plaintiff would watch television for pleasure, wash dishes, go with her friend to her friend's house, and go to church on Sundays.  (AR 46.)

## 2. VE Testimony

The ALJ asked the VE whether a hypothetical person could perform Plaintiff's past relevant work if the person was "45 years of age, with a 12th grade education and [Plaintiff's] past relevant work experience"; could lift or carry 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit six-hours each; perform simple, repetitive tasks; maintain attention, concentration, persistence, and pace; adapt to usual changes in work settings; and adhere to safety rules.  (AR 51.)  The VE testified that Plaintiff was unable to work at her past work, but could perform other jobs such as a sales attendant, mail clerk/mail sorter, and order caller.  (AR 51-52.)

The ALJ posed a second hypothetical where the person could lift 10 pounds maximum from waist level; sit approximately five hours; walk one-half block maximum; stand for less than one

hour; and had difficulty stooping, bending, kneeling, crouching, and crawling.  (AR 52.)  The VE testified that such a person could not perform Plaintiff's past work or any other jobs.  (AR 52.)

**D.    ALJ's Decision**

On February 26, 2010, the ALJ issued a decision finding Plaintiff not disabled since August 14, 2007, the date the SSI application was filed.  (AR 7-18.)  Specifically, the ALJ found that (1) Plaintiff had not engaged in substantial gainful activity from August 14, 2007, the application date; (2) Plaintiff had severe impairments of status post-left-lower-extremity fracture, depressive disorder, and obesity; (3) Plaintiff did not have an impairment or combination of impairments that met or equaled one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) Plaintiff had the RFC to perform light work as defined in 20 C.F.R. Part 416.967(b), including an ability to lift and carry 20 pounds occasionally and 10 pounds frequently, stand/walk and sit six hours in an eight-hour day, perform simple, repetitive tasks, maintain attention, concentration, persistence, and pace, relate to and interact with others, adapt to usual changes in work settings, and adhere to safety rules; (5) Plaintiff was unable to perform any past relevant work; (6) Plaintiff was defined as a younger individual on the date the SSI application was filed; (7) Plaintiff had at least a high school education and was able to communicate in English; (8) transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff was "not disabled" whether or not she had transferable job skills; (9) there were jobs that exist in significant numbers in the national economy that Plaintiff could perform; and (10) Plaintiff had not been under a disability as defined in the Act from August 14, 2007, the date the application was filed.  (AR 12-18.)

Plaintiff sought review of this decision before the Appeals Council.  On October 25, 2011, the Appeals Council denied review.  (AR 5-7.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 404.981.

**E.    Plaintiff's Contentions on Appeal**

On December 13, 2011, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision. (Doc. 1.)  Plaintiff contends that the ALJ failed to articulate specific and legitimate reasons to reject the limitations imposed on Plaintiff by the treating and examining physicians and

1  failed to obtain a reasonable explanation regarding the VE's deviation from the Dictionary of

2  Occupational Titles ("DOT").  (Doc. 13.)

3                              **III.  SCOPE OF REVIEW**

4          The ALJ's decision denying benefits "will be disturbed only if that decision is not supported

5  by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir.

6  1999).  In reviewing the Commissioner's decision, the Court may not substitute its judgment for that

7  of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  Instead, the Court must

8  determine whether the Commissioner applied the proper legal standards and whether substantial

9  evidence exists in the record to support the Commissioner's findings.  *See Lewis v. Astrue*, 498 F.3d

10  909, 911 (9th Cir. 2007).

11         "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v.*

12  *Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such

13  relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

14  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*,

15  305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both

16  the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and

17  may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v.*

18  *Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

19                              **IV.  APPLICABLE LAW**

20         An individual is considered disabled for purposes of disability benefits if he or she is unable

21  to engage in any substantial, gainful activity by reason of any medically determinable physical or

22  mental impairment that can be expected to result in death or that has lasted, or can be expected to

23  last, for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A),

24  1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).  The impairment or

25  impairments must result from anatomical, physiological, or psychological abnormalities that are

26  demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of

27  such severity that the claimant is not only unable to do his previous work, but cannot, considering

28

1   his age, education, and work experience, engage in any other kind of substantial, gainful work that

2   exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

3   The regulations provide that the ALJ must undertake a specific five-step sequential analysis

4   in the process of evaluating a disability.  In the First Step, the ALJ must determine whether the

5   claimant is currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).

6   If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment

7   or a combination of impairments significantly limiting him from performing basic work activities.

8   *Id.* §§ 404.1520(c), 416.920(c).  If so, in the Third Step, the ALJ must determine whether the

9   claimant has a severe impairment or combination of impairments that meets or equals the

10   requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1.  *Id.*

11   §§ 404.1520(d), 416.920(d).  If not, in the Fourth Step, the ALJ must determine whether the claimant

12   has sufficient RFC despite the impairment or various limitations to perform his past work.  *Id.*

13   §§ 404.1520(f), 416.920(f).  If not, in the Fifth Step, the burden shifts to the Commissioner to show

14   that the claimant can perform other work that exists in significant numbers in the national economy.

15   *Id.* §§ 404.1520(g), 416.920(g).  If a claimant is found to be disabled or not disabled at any step in

16   the sequence, there is no need to consider subsequent steps.  *Tackett v. Apfel*, 180 F.3d 1094,

17   1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

18   ## V. **DISCUSSION**

19   **A.    The ALJ's Consideration of Medical Evidence**

20   Plaintiff contends that the ALJ improperly rejected the opinions of Plaintiff's treating

21   physician, Dr. Bernstein, failed to properly credit the opinions of certain examining physicians, Drs.

22   Martin and Riffel, and relied only upon the opinions of the non-examining physicians.  (Doc. 13,

23   10:12-17:22)  Defendant asserts that the ALJ properly weighed the evidence concerning Plaintiff's

24   impairments and limitations and properly resolved the conflicts in the medical opinions.  (Doc. 14,

25   10:2-12:28.)

26   **1.    Legal Standard**

27   The medical opinions of three types of medical sources are recognized in Social Security

28   cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat

1    the claimant (examining physicians); and (3) those who neither examine nor treat the claimant

2    (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

3          Generally, a treating physician's opinion should be accorded more weight than opinions of

4    doctors who did not treat the claimant, and an examining physician's opinion is entitled to greater

5    weight than a non-examining physician's opinion. *Id.* Where a treating or examining physician's

6    opinion is uncontradicted by another doctor, the Commissioner must provide "clear and convincing"

7    reasons for rejecting the treating physician's ultimate conclusions. *Id.* If the treating or examining

8    doctor's medical opinion is contradicted by another doctor, the Commissioner must provide "specific

9    and legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by

10   substantial evidence in the record. *Id.* at 830-31; *accord Valentine v. Comm'r Soc. Sec. Admin.*,

11   574 F.3d 685, 692 (9th Cir. 2009). The ALJ can meet this burden by setting forth a detailed and

12   thorough summary of the facts and conflicting clinical evidence, stating her interpretation thereof,

13   and making findings. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

14          **2.      The ALJ's Consideration of Dr. Martin's Findings**

15          Plaintiff contends that the ALJ failed to state any reasons for rejecting examining physician

16   Dr. Martin's opinion, who assessed greater limitations to Plaintiff than those set forth in the ALJ's

17   RFC determination. (*See* Doc. 13:14-5; AR 14 (ALJ's RFC); AR 230-32 (Dr. Martin's report).)

18   Specifically, the ALJ determined that Plaintiff could perform light work and could lift and carry

19   20 pounds occasionally and 10 pounds frequently, whereas Dr. Martin opined that Plaintiff "could

20   lift no more than 10 pounds at a time and frequently . . . carry 5 pounds." (AR 232.) As such,

21   although the ALJ found that Plaintiff could perform light work (AR 14), Dr. Martin's findings would

22   limit Plaintiff to sedentary work. *See* 20 C.F.R. § 416.967(a)-(b).[4] However, the hypothetical posed

23

24          [4] Sedentary work is defined as "lifting no more than 10 pounds at a time and occasionally lifting or carrying

25   articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a
     certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and
     standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967(a).

26          Light work is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects
     weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a

27   good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or
     leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do

28   substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work,

15

by the ALJ to the VE regarding Plaintiff's ability to perform work was based on Plaintiff performing light work, not sedentary work. (*see* AR 51.)  As such, the ALJ would be required to explain why he rejected the findings of Dr. Martin in developing the RFC.

Defendant concedes that the ALJ "did not specifically explain that he rejected Dr. Martin's October 2007 opinion," but contends that there is a "legitimate inference" that the ALJ rejected Dr. Martin's opinion based on "subsequent treating records" because Dr. Martin did not have the benefit of those records. (Doc. 14, 12:1-6.)  Further, Defendant contends that the ALJ relied on the opinions of the nonexamining State agency physicians.  (Doc. 14, 12:1-6.)

In considering Dr. Martin's opinion, the ALJ found the following:

> In his October 2007 evaluation, consultative examiner Dr. Martin diagnosed obesity/deconditioned state, hypertension, asthma, non-insulin dependent diabetes mellitus and arthritis not otherwise specified; he concluded that the claimant can lift and carry 10 pounds occasionally and stand and/or walk without limitation . . . . There was no limitation on gross or fine motor manipulation.  Dr. Martin also opined that the claimant would "benefit from weight loss"; she was 5 feet, 3 inches tall and weighed 290 pounds.

(AR 16.)

The ALJ thus acknowledges Dr. Martin's opinion, but fails to offer any specific or legitimate reason for rejecting (or even accepting) Dr. Martin's findings, including the opinion  that Plaintiff was limited to lifting and carrying 10 pounds and would thus be limited to sedentary work.

"[T]he opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Lester*, 81 F.3d at 830-31.  The ALJ must provide an interpretation of the facts and conflicting clinical evidence, and make a finding based on that interpretation.  *See Tommasetti*, 533 F.3d at 1041.  Here, the ALJ failed to provide any such findings with regard to Dr. Martin and failed to provide any explanation at all as to how he viewed Dr. Martin's opinion.  As such, the ALJ failed to provide specific and legitimate reasons, as required, to reject Dr. Martin's opinion.

The Commissioner urges the Court to infer that the ALJ's rejection of Dr. Martin's findings was based on the fact that Dr. Martin did not have later treating records and that the ALJ relied upon

---

unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." *Id.* § 416.967(b).

the findings of the nonexamining State agency physicians that were consistent with the medical records. (Doc. 14, 12:1-6.)  As such, it appears Defendant is asserting that Dr. Martin's findings were inconsistent with the findings of other physicians.  However, stating that a physician's opinion is consistent or inconsistent with the record is an insufficient reason for accepting or rejecting it. Mere inconsistency between doctors' opinions does not allow the ALJ to simply select one opinion based solely on the fact that an inconsistency exists.  It is the ALJ's responsibility to address the conflict and explain how the conflict is resolved by assigning weight to differing opinions based on cogent, specific, and legitimate reasons. *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 603 (9th Cir. 1999); *Reddick v. Chater*, 157 F.3d 715, 722, 725 (9th Cir. 1998).  Merely pointing out (or inferring) that a conflict of opinion exists is not a legitimate ground, in and of itself, to assign weight to credit or discredit one of the opinions.  The ALJ must explain why that weight was assigned.

Here, the ALJ failed to discuss his findings as to Dr. Martin's opinion and merely offered the RFC without providing any explanation as to how Dr. Martin's opinion contributed to the ALJ's determination. (AR 16.)  The ALJ cannot simply offer conclusions in the guise of findings.  *Cf. Kepler v. Chater* 68 F.3d 387, 391 (10th Cir. 1995).  The ALJ may not set forth conclusions implying that a doctor's findings are rejected without providing an interpretation of the facts.  "The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Embrey v. Bowen*,  849 F.2d 418, 421-22 (9th Cir. 1988).  It is the ALJ's lack of explanation, not necessarily the ALJ's ultimate conclusion, that is problematic here.

Further, while the Court can draw reasonable inferences that exist from the ALJ's opinion, *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989), the Court cannot consider Defendant's post-hoc rationalizations.  The Ninth Circuit has repeatedly emphasized that the "bedrock principle of administrative law" is that a "reviewing court can evaluate an agency's decision only on the grounds articulated by the agency." *Ceguerra v. Sec'y of Health & Human Servs.*, 933 F.2d 735, 738 (9th Cir. 1991); *see also Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003) (noting that a reviewing court is "constrained to review the reasons the ALJ asserts.").  An agency's decision cannot be affirmed on the ground that the agency did not invoke in making its decision. *Pinto v.*

1    *Massanari,* 249 F.3d 840, 847-48 (9th Cir. 2001).  Here, Defendant is urging the Court to consider

2    reasons for rejecting Dr. Martin's opinion that were not set forth in the ALJ's decision.

3          The ALJ failed to offer any reasons to discount Dr. Martin's opinions, and thus did not meet

4    the burden to provide specific and legitimate reasons for rejecting Dr. Martin's findings.

5          **3.      The ALJ's Consideration of Dr. Bernstein's Findings**

6          Plaintiff contends that the ALJ improperly rejected treating physician Dr. Bernstein's

7    assessment of Plaintiff's abilities with insufficient rationale.  (Doc. 13, 11:4-13:17.)  Defendant

8    asserts that the ALJ properly discredited Dr. Bernstein's opinion because the doctor did not properly

9    explain the significant limitations he assessed and that the treatment records failed to support Dr.

10   Bernstein's findings.  (Doc. 14, 12:15-28.)

11         The ALJ assessed the findings of Dr. Bernstein as follows:

12
13         In his February 2010 Medical Source Statement, Dr. Bernstein, who indicated he has
           been the claimant's treating physician for 3 years, reported diagnoses of diabetes,
           hypertension, degenerative disc disease, and bipolar disorder . . . . He concluded that
14         the claimant cannot handle even low stress jobs, can rarely lift and carry even
           10 pounds, and can sit, stand/walk less than 2 hours . . . . However, he gives no
15         specific rationale to support these significant limitations, and his own treatment
           record noted above is also inconsistent with his opinion.  Consequently, I have given
16         the opinions of . . . [Dr.] Bernstein little weight.

17   (AR 16.)

18         In discussing Plaintiff's treatment records, the ALJ did not explicitly indicate which records

19   belonged to Dr. Bernstein, but summarized all the treatment records concerning Plaintiff's physical

20   conditions as follows:

21
22         Most of the records from October 2006 through February 2010 show monthly follow
           ups for medication management for diabetes, hypertension, morbid obesity, a history
           of arthritis, bipolar disorder, and asthma . . . . Notes indicate the claimant weighs 279
23         pounds . . . . A clinical note of December 4, 2007[,] indicated that the claimant
           sustained a left leg fracture when she fell in her yard . . . .; the x-ray of her ankle
24         showed a mildly displaced fracture and soft tissue swelling.  By February 2008, the
           claimant was doing well, but still had some swelling; she was also urged to lose
25         weight . . . . In February 2009, the claimant did complaint of left leg pain . . . and in
           May 2009, bilateral knee pain . . . , but the only treatment prescribed was routine
26         medication.

27   (AR 15.)

28

In assigning "little weight," to Dr. Bernstein's opinion of Plaintiff's capabilities, the ALJ found that the opinion was "inconsistent" with Dr. Bernstein's own treatment records and that he gave "no specific rationale to support the[] significant limitations" imposed upon Plaintiff. (AR 16.) "[A]n ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole, or by objective medical findings." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (citation omitted). The ALJ, however, failed to state how the opinion is inconsistent or how the treatment records differ from Dr. Bernstein's opinion. As noted above, merely concluding that a physician's opinion is inconsistent with the record, without explanation, is insufficient. "To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required, even when the objective factors are listed seriatim." *Embrey*, 849 F.2d at 421. As such, the ALJ cannot simply offer his conclusions but must instead "set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* at 421-22.

By failing to explain his conclusions, the ALJ did not provide specific and legitimate reasons to reject Dr. Bernstein's findings.

**4.     The ALJ's Consideration of Dr. Riffel's Findings**

In regards to Plaintiff's mental limitations, Plaintiff asserts that the ALJ erred in the assessment of examining physician Dr. Riffel's opinion, asserting that the ALJ erred by assigning greater weight to the nonexamining physicians. (Doc. 13, 16:21-23.) Defendant contends that the ALJ considered Plaintiff's longitudinal records regarding her mental health treatment and properly relied upon the opinions that were consistent with the treatment records. (Doc. 14, 10:17-28.)

In considering Dr. Riffle's opinion, the ALJ found:

In November 2007, consultative psychologist Dr. Riffel diagnosed bipolar disorder not otherwise specified and rated the GAF at 55, indicating moderate impairment in occupational, community and socialization functioning . . . . Nonetheless, she concluded that the claimant's ability to perform simple, repetitive tasks was fair, but her ability to relate to others appropriately and tolerate the usual stresses and pressures associated with day[-]to[-]day work was impaired. However, the mental status exam (the part based on observations) was essentially normal, while the rest of the narrative appears based on the claimant's subjective report. Furthermore, there

is nothing in the longitudinal record discussed above that supports the severity of these limitations.

(AR 16.)

In reviewing Plaintiff's mental health treatment records, the ALJ determined the following:

A January 2009 letter from the county mental health department reported that the claimant has been seen in the clinic since July 2003, has a diagnosis of bipolar disorder, depress[ion], and takes Klonopin, Lamictal, Lexapro and Seroquel . . . . However, there appears to be a big break in treatment from 2003 to October 2006, when it was reported that the claimant was noncompliant with her medications . . . . Another note indicated that when the claimant is compliant, her mood is stable.

(AR 15.)

In rejecting Dr. Riffle's findings, the ALJ determined that the findings were not supported by Dr. Riffle's own findings of an "essentially normal" mental status examination, were based upon Plaintiff's subjective report, and were contrary to the longitudinal treatment records.  (AR 16.)

If a doctor's conclusions are not consistent with his own findings, that is a specific and legitimate reason for rejecting that opinion.  *See Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986) (per curiam) (treating doctor's conclusory opinion that claimant was disabled was properly rejected by ALJ when it was internally inconsistent and not consistent with doctor's prior medical reports); *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) ("The ALJ need not accept the opinion of any physician . . . if that opinion is brief, conclusory, and inadequately supported by clinical findings.")  Here, the ALJ determined that Dr. Riffle's opinion was inconsistent with her own findings in the mental status examination.  (*See* AR 16, AR 244-45.)

Further, the ALJ found that Dr. Riffle relied upon Plaintiff's reporting in determining limitations, and not on objective findings.  The ALJ, however, found Plaintiff to be less than fully credible.[5]  (AR 15.)  An ALJ may reject a physician's opinion "if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible."  *Tommasetti*, 533 F.3d at 1041 (citation omitted).

_____

[5] Plaintiff did not challenge the ALJ's credibility finding on appeal, and thus has waived any such argument. *See Greger v. Barnhart*, 464 F.3d 968, 973 (9th Cir. 2006) (arguments not raised before the district court are generally waived).

Lastly, the ALJ noted that Dr. Riffle's opinion deviates from the findings made in the longitudinal record. (AR 16.) Here, the ALJ specifically discussed Plaintiff's mental health treatment, noting that there appeared to be a "big break in treatment from 2003 to October 2006," and that Plaintiff was not compliant with her medication. (AR 15.) The ALJ determined, however, that the treatment notes indicated that Plaintiff's "mood is stable" when she is medication compliant. (AR 15.) As such, the ALJ noted specific findings in the treatment record and indicated that these findings did not support the limitations determined by Dr. Riffle. (AR 16.) Accordingly, the ALJ provided specific and legitimate reasons to reject Dr. Riffle's opinion.[6]

### 5.      Remand is Appropriate

For the reasons set forth above, the Court finds that the ALJ did not provide specific and legitimate reasons to reject the opinions of Drs. Martin and Bernstein. Remand is appropriate when, like here, a decision does not adequately explain how a conclusion was reached, "[a]nd that is so even if [the Commissioner] can offer proper post hoc explanations for such unexplained conclusions," for "the Commissioner's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Barbato v. Comm'r of Soc. Sec.*, 923 F. Supp. 1273, 1276 n.2 (C.D. Cal. 1996) (citations omitted).

The Court hastens to note, however, that it is not suggesting that the ALJ's ultimate conclusions were necessarily incorrect – only that the decision was conclusory and failed to provide reasons for rejecting, or even accepting, certain opinions. It is the province of the ALJ, not the Court, to assess the medical evidence. The Court cannot affirm the ALJ's conclusions on grounds that were not invoked by the agency. *Ceguerra*, 933 F.2d at 738.

---

[6] The ALJ's decision differs as to its rejection of the findings of Drs. Riffle and Bernstein. Although the ALJ notes both opinions are inconsistent, the ALJ only identifies the inconsistencies when rejecting Dr. Riffle's opinion – i.e., specifically noting internal inconsistencies with Dr. Riffle's own findings and indicating inconsistencies in the treatment records related to medication compliance and mood stability. (*See* AR 15-16.) The ALJ does not provide enough information concerning Dr. Bernstein's treatment record to support the blanket assertion that it was inconsistent with his opinion, and the Court cannot affirm a decision on ground that the ALJ did not invoke in making the decision. *See Pinto,* 249 F.3d at 847-48.

**B.     The ALJ's Reliance on VE Testimony**

Plaintiff contends that the ALJ erred in relying on the VE's testimony, asserting that the jobs proffered by the VE deviated from the DOT.  Plaintiff contends that because the ALJ's RFC limited Plaintiff to "simple, repetitive tasks," the jobs indicated by the VE that required a reasoning level 2 are "not consistent" with Plaintiff's capabilities.[7]  (Doc. 15, 7:19-8:2.)

Because the Court remands this case for renewed consideration of the medical evidence, which may impact the ALJ's RFC determination and thus potential jobs that Plaintiff could perform, the Court dispenses with an exhaustive analysis of whether the VE's testimony deviated from the DOT.  The ALJ may be required to reassess the jobs that Plaintiff can perform if the RFC is altered due to the reconsideration of the medical evidence.

The Court notes, however, that Plaintiff's assertion that reasoning level 2 jobs are inconsistent with an RFC of simple, repetitive tasks is contrary to a majority of court decisions finding that simple, repetitive tasks are consistent with reasoning level 1 and 2 jobs, but not consistent with reasoning level 3 jobs.  See *Grimes v. Astrue*, No. EDCV 09-2208-JEM, 2011 WL 164537, at *4 (C.D. Cal. Jan. 18, 2011); *Smith v. Astrue*, No. EDCV 10-1393-JEM, 2011 WL 2749561, at * 5 (C.D. Cal. July 13, 2011); *McGensy v. Astrue*, No EDCV 09-152 AGR, 2010 WL 1875810, at *3 (C.D. Cal. May 11, 2010); *Tich Pham v. Astrue*, 695 F. Supp. 2d 1027, 1032 n. 7 (C.D. Cal. 2010); *Etter v. Astrue*, No. CV 10-582-OP, 2010 WL 4314415, at *3 (C.D. Cal. Oct. 22, 2010); *Carney v. Astrue*, No. EDCV 09-1984-JEM, 2010 WL 5060488, at * 4 (C.D. Cal. Dec. 6, 2010); *Pak v. Astrue*, No. EDCV 08-714-OP, 2009 WL 2151361, at *7 (C.D. Cal. July 14, 2009); *Tudino v. Barnhart*, No. 06-CV-2487-BEN (JMA), 2008 WL 4161443, at * 11 (S.D. Cal. Sept. 5, 2008) ("Level two reasoning appears to be the breaking point for those individuals limited to only simple, repetitive tasks); *Squier v. Astrue*, No. EDCV 06-1324-RC, 2008 WL 2537129, at * 5 (C.D. Cal., Jun. 24, 2008); *see also* each *Lara v. Astrue*, 305 F. App'x 324, 326 (9th Cir. 2008)

---

[7] Plaintiff's opening brief asserts that the jobs indicated by the VE required a reasoning level 3; however, Plaintiff's reply brief concedes that she "incorrectly stated" the occupations in the opening brief.  (*See* Doc. 13, 18:1-19:23; Doc. 15, 6:10-8:2 and n. 1.)

(unpublished) (suggesting that jobs requiring more than level 1 or 2 reasoning skills, as defined by the DOT, are arguably inconsistent with limitations for simple, repetitive work).

## VI.  CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is, therefore, REVERSED and the case REMANDED to the ALJ for further proceedings consistent with this order.   The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Machael Marie Castro and against Defendant Carolyn W. Colvin, Acting Commissioner of Social Security.


IT IS SO ORDERED.

**Dated:     February 28, 2013                         /s/ Sheila K. Oberto**
UNITED STATES MAGISTRATE JUDGE